FRANK FRANER v. C. E. ENGLISH, et al.

Eastern Section. April 7, 1928.

No petition for Certiorari was filed.

Fletcher R. Morgan, of Chattanooga, for plaintiff in error.
Thos. S. Myers, of Chattanooga, for defendant in error.

PORTRUM, J. This case was instituted before a Justice of the Peace. C. E. English and D. A. Keener were neighbors and owned in partnership a valuable female bird dog, which was unregistered, and was at large on the 18th of August, 1925, on Tunnel boulevard east of Missionary Ridge and in a suburb of the City of Chattanooga, when

she was run down by an automobile owned and driven by Frank Franer, and killed. At the point of the collision between the automobile and the dog, the street was more than twenty feet wide, and the dog was on the extreme left hand side, or within three or four feet of the curbing, gnawing a bone. Franer ran over to the left of the street to pass around a pedestrian walking on the right hand side in the street and as he passed the pedestrian he looked back over his shoulder at the pedestrian and while he was so engaged he ran over the dog, without seeing her. At the time there was nothing to obstruct his course in the street and to prevent him running around and missing the dog.

This dog was about two years old and the mother of a litter of pups. She had been confined in a back yard, securely boarded up, with the gate fastened from the inside so as to prevent any one from without opening the gate and releasing the dog. It is not disputed that she was at the time subject to registration and that her owners were keeping her without giving her in to the county court clerk for registration, as is required by law. But it is contended that this fact should make no difference in determining this controversy, for it is claimed she was not at the time running at large as contemplated by the statute which declares female unregistered dogs more than six months of age when running at large a public or common nuisance. It is insisted that the owners had this dog securely confined and that some unknown person, without their knowledge, released her, presumably the wash woman who was at the home of C. E. English.

The trial judge took the view that if the dog was at large without the knowledge or consent of the owners then it was not at large as contemplated by the statute, and he charged the jury that if the plaintiff permitted the dog to run at large "or acquiesced in it or failed to use reasonable means to keep it confined" then the plaintiffs could not recover. From the facts the jury found the plaintiffs did not permit or acquiesce in the dog running at large and did use reasonable means to confine it and as a result a verdict in favor of the plaintiffs was reached and the damage fixed at $100. From the verdict and judgment the defendant has prosecuted an appeal to this court, and assigns as error that there is no evidence to support the verdict, the controlling question being that since the dog was an unregistered female running at large, she was declared by statute to be a public or common nuisance and, therefore, the defendant had a right to intentionally abate this nuisance and since he had this right he could not be held responsible for unintentionally or negligently doing what he had a right to do intentionally in the first instance. The statute in question reads as follows:

Shannon's Code, section 2853a6. "The running at large of female dogs, not registered as hereinbefore provided, is hereby declared to be a public nuisance, and that all persons owning or keeping

any female dog three months old or over in this State are hereby required to report the same for registration to the circuit court clerk of the county in which the female dog is kept.''

Of course, if the unintentional escape of an unregistered female dog did not constitute a ''running at large'' as contemplated by the statute then, of course, the dog per se is not a nuisance subject to abatement, the dog at the time being an unoffensive object upon the street. But it is insisted that the trial judge was not warranted in adding an exception to the statute by saying that a dog was not in fact running at large when it had escaped from its confines. There is much reason in this insistence. But for the present we will disregard this position taken by the trial judge and assume that the dog was in fact running at large and thereby declared by statute to be a public nuisance. Then, (a) is it permissible for the legislature to declare a citizen's property per se a public nuisance? And, if so, (b) is it permissible for an individual to abate a public nuisance by the destruction of the property in the absence of special injury to the individual?

(a) We conclude that it is within the legislative power to declare the running at large of unregistered female dogs to be a public nuisance. The right of property in a dog has always been considered a limited right since dogs are not classed as with other domestic animals.

''The very fact that they are without the protection of the criminal laws shows that property in dogs is of an imperfect or qualified nature, and that they stand, as it were, between animals ferae naturae in which, until killed or subdued, there is no property, and domestic animals, in which the right of property is private and complete. They are not considered as being upon the same plane as horses, cattle, sheep, and other domesticated animals, but rather in the category of cats, monkeys, parrots, singing birds, and similar animals kept for pleasure, curiosity or caprice. They have no intrinsic value, by which we understand a value common to all dogs as such, and independent of the peculiar breed or individual. Unlike other domestic animals, they are useful neither as beasts of burden, for draft (except to a limited extent), nor for food. They are peculiar in the fact that they differ among themselves more widely than any other class of animals, and can hardly be said to have a characteristic common to the entire race. While the highest breeds rank among the noblest representation of the animal kingdom, and are justly esteemed for their intelligence, sagacity, fidelity, watchfulness, affection, and above all for their natural companionship with men, others are afflicted with such serious infirmities of temper as to be little better than a public nuisance. All are more or less subject to attacks of hydrophobic madness.

"As it is practically impossible by statute to distinguish between the different breeds, or between the valuable and the worthless, such legislation as has been enacted upon the subject, though nominally including the whole canine race, is really directed against the latter class, and is based upon the theory that the owner of a really valuable dog will feel sufficient interest in him to comply with any reasonable regulation designed to distinguish him from the common herd. Acting upon the principle that there is but a qualified property right in them, and that, while private interests require that the valuable ones should be protected, public interests demand that the worthless shall be exterminated, they have, from time immemorial, been considered as holding their lives at the will of the legislature, and properly falling within the police powers of the several states. . . .

"Statutes of the general character of the one in question have been enacted in many of the states, and their constitutionality, though often attacked, has been generally, if not universally, upheld." (The statute referred to was one requiring the registration of dogs and granting immunity to persons destroying unregistered dogs.) Sentell v. N. O. & C. R. Co. (1897), 126 U. S. Supreme Court 701. 41 L. Ed. 1169.

Laws passed requiring the registration of dogs in this state have also been held constitutional. State v. Erwin, 139 Tenn., 341, 20 S. W. 973. Ponder v. State, 141 Tenn., 481, 212 S. W. 417.

(b) We are of the opinion that an individual may abate a public nuisance only when he suffers an injury peculiar to himself, and in the absence of such injury then it is the function of the public officers of the state to abate the nuisance.

Under the head of "The redress of private wrongs by the mere act of the parties", Mr. Blackstone in his commentaries classified the rights as follows:

"Wrongs are divisible into two sorts or species: private wrongs and public wrongs.

"The first of that redress of private injuries which is obtained by the mere act of the parties. This is of two sorts: first, that which arises from the act of the injured party only; and, second, that which arises from the joint act of all the parties together: both of which I shall consider in their order.

"Of the first sort, or that which arises from the sole act of the injured party" is:

(1) The defense of one's self, or the mutual and reciprocal defense of such as stand in the relation of husband and wife, parent and child, master and servant.

(2) Recapture or reprisal is another species of remedy by the mere act of the party injured.

(3) As a recapture is a remedy given to the party himself for an injury to his personal property, so, thirdly, a remedy of the same kind for injuries to real property is re-entry on the lands and tene-

ments which another person without any right has taken possession of.

(4) A fourth species of remedy by the mere act of the party injured is the abatement or removal of a nuisance.

Defining a public nuisance, Mr. Blackstone says:

"Common nuisances are a species of offenses against the public order and economical regimen of the state being either the doing of a thing to the annoyance of all the king's subjects, or the neglecting to do a thing which the common good requires." Book 4, Chap. 13, page 166.

Again, "Nuisance, nocumentum, or annoyance, signifies anything that worketh hurt, inconvenience or damage. Nuisances are of two kinds: public or common nuisance, which affects the public, and are annoyance to all the king's subjects: for which reason we must refer them to the class of public wrongs, or crimes and misdemeanors: and private nuisances, which are the objects of our present consideration, and may be defined, anything done to the hurt or annoyance of the lands, tenements or hereditaments of another."

According to the foregoing definition, it has always been held necessary for an individual to have first suffered an injury to himself different in kind from that suffered by the public before he could maintain an action to recover damages or to abate the nuisance. It has always been recognized as the right of the individual to summarily abate a private nuisance, or a public nuisance out of which he suffers a special injury to himself different from the injury suffered by the public. And due to this last distinction some of the text writers, as well as some of the judges, have declared that "any person may abate a common nuisance", one learned judge stating that the language of the cases warrants this conclusion. Hart v. Mayor etc., 9 Wend. (N. Y.) 609 (1832).

But the later New York cases qualify this holding. Discussing this question, the court said:

"These authorities sufficiently establish the proposition that the constitutional guaranty does not take away the common-law right of abatement of nuisances by summary proceedings, without judicial trial or process. But in the process of abating a nuisance there are limitations both in respect of the agencies which may be employed, and as to what may be done in execution of the remedy. The general proposition has been asserted in text books and repeated in judicial opinions, that any person may abate a public nuisance. But the best considered authorities in this country and England now hold that a public nuisance can only be abated by an individual where it obstructs his private right, or interferes at the time with his enjoyment of a right common to many, as the right of passage upon the public highway, and he thereby sustains a special injury. Brown v. Perkins, 12 Gray 89; Mayor etc. v. Brook, 7 Ad. & El. 339. Dimes v. Petley, 15

id. 276; Fort Plain Bridge Co. v. Smith, 30 N. Y. 44; Harrower v. Ritson, 37 Barb. 301.

"The public remedy is ordinarily by indictment for the punishment of the offender. . . . There are nuisances arising from conduct, which could only be abated by the arrest and punishment of the offender and in such cases it is obvious the legislature could not direct the sheriff or other officer to seize and flog or imprison the culprit. The infliction of punishment for crime is a prerogative of the court and cannot be usurped by the legislature. The legislature can only define the offense and prescribe the measure of punishment, where guilt shall have been judicially ascertained. But as the legislature may declare nuisances, it may also, where the nuisance is physical and tangible, direct its summary abatement by executive officers, without the intervention of judicial proceedings, in cases analogous to those where the remedy by summary abatement existed at common law.

" . . . It cannot be denied that in many cases a nuisance can only be abated by the destruction of the property in which it consists. The cases of infected cargo or clothing and of impure or unwholesome food are plainly of this description. They are nuisances per se, and their abatement is their destruction. So, also, there can be little doubt, as we concede it, that obscene books or pictures or implements only capable of illegal use, may be destroyed as a part of the process of abating the nuisance they create, if so directed by statute. The keeping of a house of ill fame is a nuisance at common law. But the tearing down of the building so kept, would not be justified as the exercise of the power of summary abatement, and it would add nothing, we think, to the justification that a statute was produced authorizing the destruction of the building summarily as a part of the remedy. The nuisance consists in the case supposed in the conduct of the owner or occupants of the house, in using it or allowing it to be used for the immoral purpose, and the remedy would be to stop the use; this would be the only mode of abatement in such case known to the common law, and the destruction of the building for this purpose would have no sanction in common law or precedent." (Citing cases) Lawton v. Steele, 119 N. Y. (74 Sickels) 236.

From the foregoing the legislature probably may not be justified in authorizing the destruction of an inoffensive unregistered female dog, while at large, because it is not per se a nuisance at all times; and it might authorize its destruction at such times as it was an offensive object upon the streets. But the legislature has not done more than declare an unregistered female dog running at large a public nuisance. Then the state may abate the nuisance acting through its public officials, but an individual suffering no injury different in kind from that suffered by all the people has no right to run over and destroy an unregistered female dog while she is at large.

This is borne out by the text writers also.

"In a few cases the party injured is allowed to redress his own wrong, in whole or in part, without calling in the aid of the law. But the cases in which this is permitteed are not numerous, and they are in the main cases of urgency, in which a resort to the ordinary remedies would be inadequate to complete justice. . . . The redress here consists in removing that which constitutes a nuisance,. and it is allowed, not because of any injury it may have done, but ·to prevent the injury it may do. It is, therefore, in some sense, a preventive remedy, not a compensatory remedy; for damages suffered the party is left to the ordinary action.

"The question who may abate a nuisance may depend upon whether the nuisance is public or private. If it is a private nuisance, he only can abate it who is injured by its continuance; if it is a public nuisance, he only may abate it who suffers a special grievance not felt by the public in general. Therefore, if one places an obstruction in a public street, an individual who is incommoded by it may remove it; but unless he has occasion to make use of the highway he must leave the public injury to be redressed by the public authorities. It is the existence of an emergency which justifies the interference of the individual.

"In all cases one who attempts to abate a thing as a nuisance acts at his peril and will be liable for the consequences, unless he can establish the fact of nuisance. In permitting this redress certain restrictions are imposed to prevent abuse or unnecessary injury. One of these is, the right must not be exercised to the prejudice of the public peace: another is, as a general rule, before resorting to such extreme measures the party responsible for the nuisance should be notified of its existence and requested to remove it. . . . This, however, is by no means a universal rule. . . ." Cooley on Torts, 57.

This disposes of the public nuisance phase of the case, but it is necessary that we notice another question brought out in a special request to the judge to charge in reference to contributory negligence. The case of C. N. O. & T. P. R. Co. v. Ford, 139 Tenn., 292, is to be distinguished from this case in that the dog in that case was knowingly permitted to run at large, in violation of the statute, which as it was held there was such contributory negligence as would have barred the action had it been based upon the common law. But in this case the dog was not intentionally permitted to run at large and the statute provides it shall be unlawful for any person to "allow" a dog to run at large; therefore, before a person could be guilty of contributory negligence he must intentionally allow. In discussing this question the Court of Civil Appeals in the case of Chattanooga Railway & Light Company v. F. W. Prince, Hamilton Law, 1923, speaking through Judge Crownover, said:

"Our statute (Shannon's Code 2853a4) above quoted "it shall be unlawful for any person to allow a dog belonging to him. . . . to go upon the premises of another or upon the highway" etc., the word "allow" means "consent to", "to permit", "to license" or "to suffer" and implies knowledge or consent or acquiescence. It further implies that the owner must take reasonable precautions to guard against the running at large of his dog."

The Ford case, supra, is not authority for the proposition that one can summarily abate a public nuisance. It only held that a railway company was not required to observe the statutory precautions (Sections 1574-1576, Shannon's Code) when an unregistered female dog appeared upon the railway tracks.

There was an application made in the trial court for a continuance because of the absence of a witness who would testify that the dog in question was vicious and that he had had a fight with the dog, using a stick. The affidavit contains the statement that the defendant could not "prove this fact as fully by any one else as by the witness Williams." Had this witness been present his testimony would have been cumulative only and in cases of this character a wide discretion is given to the Circuit Judge. This case had been tried twice in the circuit court and the judge was doubtless familiar with the testimony given on the first trial. It is not shown that the defendant would have the witness present at another time. If the dog had been shown to have been a vicious dog the case might be somewhat different but this issue was settled by the jury in favor of the plaintiffs who contended the dog was a docile bird dog. The defendant had no right to negligently kill the dog in question and destroy the property of the plaintiffs under the circumstances without compensating them.

It follows that there was no error in the judgment of the lower court, which is affirmed.

Snodgrass and Thompson, JJ., concur.